**UNITED STATES of America,**

v.

**Julio FAMIGLIETTI, Defendants.**

**C.R. Action No. H–07–113.**

United States District Court,
S.D. Texas,
Houston Division.

April 21, 2008.

Daniel Kaleba, Esq., Assistant United States Attorney, for United States of America.

For Defendant, Julio Famiglietti, no appearance.

## ORDER ADOPTING REPORT AND RECOMMENDATION

DAVID HITTNER, District Judge.

This matter comes before this Court on Magistrate Judge Wayne D. Brazil's Report and Recommendation re: Motion for Forfeiture of Bond and Judgment and Motion for Enforcement of Sureties' Obligation. Neither defendant nor any of the sureties has filed objections to Magistrate Judge Brazil's Report and Recommendation.

Having considered the report, and the recommendations therein, and for good cause appearing, it is hereby

ORDERED that Magistrate Judge Brazil's Report and Recommendation is ADOPTED IN ITS ENTIRETY.

IT IS FURTHER ORDERED that the government's Motion for Forfeiture of Bond and Judgment and Motion for Enforcement of Sureties' Obligation are GRANTED as set forth in the Report and Recommendation.

IT IS FURTHER ORDERED that judgment shall be entered in favor of plaintiff and against defendant, individually, in the amount of $250,000.00.

IT IS FURTHER ORDERED that judgment shall be entered in favor of plaintiff and against each of the sureties individually, jointly and severally, in the amount of $250,000.00.

## REPORT AND RECOMMENDATION RE GOVERNMENT'S MOTION FOR FORFEITURE OF BOND AND ENTRY OF JUDGMENT ON FORFEITURE OF BOND AND FOR ENFORCEMENT OF SURETIES' OBLIGATION

WAYNE D. BRAZIL, United States Magistrate Judge.

### BACKGROUND

On March 1, 2007, the United States Attorney for the Southern District of Texas filed a complaint charging Julio Famiglietti with possessing and transporting child pornography. The charges were based on a search of Mr. Famiglietti as he was re-entering this country (at the Houston airport) after a trip to Panama. The searching agents allegedly found in his effects thousands of images of child pornography and more than 100 movies (most or all of which were electronically stored), some featuring molestation of children. The agents also found a female child's underpants and sexual novelties. They subsequently determined that the defendant also had a credit card subscription to a child pornography web site.

The District Court in Houston issued a warrant for Mr. Famiglietti's arrest. Several days later, United States Marshals arrested Mr. Famiglietti in the Northern District of California, where he resides with his wife and three of his four adult children.

The undersigned conducted two detention hearings in this matter, one on March 7, 2007, and the second on March 15, 2007. Mr. Famiglietti's wife and two adult daughters attended both hearings; his son Gulio also attended the hearing on the 15th. In each of these hearings the government emphasized the extent and character of the child pornography the defendant had possessed and the serious risk of flight his release would pose. The government pointed out, among other things, that the defendant was a citizen of three countries (Panama being one of them) and that he had engaged in considerable international travel.

During the hearing on March 7th the government also informed the Court that a search of the house in which the defendant, his wife, and three adult children reside "yielded a large collection of over 3700 pictures of child pornography." Transcript at 11:11–13. This proffer by the government caused the Court to express concern (on the record) about whether any of the proposed sureties, all of whom had lived in the same house with defendant for a considerable period, had any knowledge of or reason to suspect Mr. Famiglietti's involvement with child pornography. Defense counsel elected not to address the Court's concern about that possibility.

At the end of the hearing on March 15, 2007, the Court decided to release the defendant to a half-way house on the condition that his wife and three of his adult children sign a bond in the amount of $250,000, secured, at least in part, by the

equity in the house in which all of them resided.

Before anyone signed the bond, the Court energetically warned all the proposed sureties that if the defendant were released from custody, on any set of conditions, the sureties would face a very real risk that he would violate the terms of release either by having more contact with child pornography or by fleeing. Transcript March 15, 2007, hearing at 10–15. Pointedly, the Court warned the sureties that the evidence the government had described and the nature of the charges against the defendant suggested strongly that he was under the influence of a powerful addiction and that his capacity for self control might well be substantially compromised.

The Court also emphasized that each surety was making an independent decision about whether to sign the bond and that, if the defendant fled, each surety would owe the government the full value of the bond ($250,000). It was only after being satisfied that all of the sureties understood both the risk they were accepting and the consequences that would ensue if the defendant fled that the Court agreed to release the defendant to the half-way house.

The bond imposes a variety of conditions on the defendant. They include, among others, requirements that he make all of his duly ordered court appearances, both here and in the Southern District of Texas, that he submit to Pretrial Services' supervision and direction, reside full time at the half-way house (Cornell Corrections in Oakland, California), and surrender his United States, Panamanian, and Italian passports. The release order also directed the defendant to appear in the federal district court in Houston, Texas, on March 29, 2007.

The Court required Mr. Famiglietti to provide the Pretrial Services Office here with his itinerary before traveling to Texas. The defendant's wife had agreed to escort him to and from Houston. "Motion for Forfeiture of Bond and Judgment against Defendant and Motion for Enforcement of Sureties' Obligation" ("Motion") at Ex. B; see also, Pretrial Services Chronological Record Report for the defendant, ("PSCRR") at 14, 16, 17. On March 21st she provided Pretrial Services with confirmation of airline reservations that showed that she and the defendant would fly to Houston (through Los Angeles) on March 27th and return to this district (via Phoenix) late in the evening of March 29th. Motion at Ex. F.

On March 27th Mrs. Famiglietti left a voice-mail message for the defendant's Pretrial Services Officer, reporting that the defendant's appearance in federal court in Houston had been postponed, but that he still would be traveling to Houston to make his appearance in state court and to consult with his lawyer there. PSCRR at 20. In this message, Mrs. Famiglietti did not state that she would not be accompanying the defendant, but she also did not confirm that she still intended to accompany him. *Id.*, (third entry for March 27, 2007). On March 28, 2007, the defendant's Pretrial Services Officer left a message for Mrs. Famiglietti asking whether she was with her husband in Houston and seeking a return phone call. PSCRR at 20. Mrs. Famiglietti did not return this call. PSCRR at 24.

According to Mr. Famiglietti's lawyer in the state court proceedings in Houston, the defendant made his court appearance in that matter on the morning of March 29th. *Id.*, at 22. Later that day he flew on Southwest Airlines from Houston to Phoenix, as scheduled. At the Phoenix airport he checked in for the Southwest

flight back to Oakland—but did not take it. *Id.,* at 21. He has not been seen or heard from since by the government, his Pretrial Services Officer, or any employee of any court.

On March 29, 2007, a grand jury in the Southern District of Texas issued an Indictment charging Mr. Famiglietti with violations of federal child pornography laws. # : 4:07-cr-00113. After the defendant failed to make his initial appearance in the federal court in Houston as ordered on April 5, 2007, the assigned District Judge caused a warrant to issue for his arrest. The undersigned had caused a warrant to issue for defendant's arrest on April 2, 2007. Mr. Famiglietti remains a fugitive.

On April 27, 2007, according to an uncontradicted proffer by the government, defendant applied for travel documents from the Panamanian Embassy in Mexico City. The government believes that the consulate in Mexico City issued the defendant a new passport—which he used to enter Panama sometime in May of 2007.

On January 8, 2008, the government filed its "Motion for Forfeiture of Bond and Judgment against Defendant and Motion for Enforcement of Sureties' Obligation" ("Motion"), asking the court to forfeit all cash and property posted to secure the bond, to enter judgment against defendant in the amount of $250,000.00, and to enforce the sureties' obligation.[1] Even though the bond secured the defendant's appearance in proceedings in the federal district court in Houston, Texas, the government filed its Motion in this court because it was this court that issued the bond and because all the sureties reside (and their property is located) in the Northern District of California.

The Court initially issued an order setting this matter for a hearing to be conducted February 27, 2008, and establishing a briefing schedule. That order and the government's Motion were served by certified mail on defendant and the sureties at their last known address. See, January 11, 2008, Order and Proof of Service. Copies of the January 11th Order and Motion mailed to the sureties were returned unclaimed on February 1, 2008. See, Docket and February 8, 2008, Order. Believing that the sureties had not received its January 11th Order, the Court rescheduled the hearing to March 19, 2008, and established a new briefing schedule. The Court directed the U.S. Marshal to serve both its January 11th and February 8th Orders on the sureties. As we understand it, the Marshal did not effect service of these documents as ordered.

Three of the sureties, adult children of the defendant, appeared in court on February 27, 2008, expecting the hearing to occur on that date as originally scheduled. In dialogue with the Court, they indicated that they had in fact received the Court's original scheduling Order. Because the other parties who are involved in this matter were not present (having been notified that the hearing had been postponed), the Court informed the three sureties that the hearing was continued to March 19, 2008, and that they could submit evidence or argument in writing before that date. The

---

1. The bond at issue in this matter was entered to secure the defendant's presence for proceedings in the Southern District of Texas. *After* this bond was executed and *after* the defendant became a fugitive, a grand jury sitting in the Northern District of California also indicted Mr. Famiglietti on child pornography charges. See Cr 07-0471 DLJ. The government filed its Motion in the above-captioned case and in Cr 07-0471 DLJ. However, because the bond had issued only in relation to the charges that had been filed in the Southern District of Texas, these forfeiture proceedings do not arise under the case against Mr. Famiglietti that is pending in the Northern District of California.

Court also personally delivered to the sureties copies of the January 11th and February 8th Orders. See, Transcript March 19, 2008, hearing.

The Court conducted a lengthy hearing on the government's motion on March 19, 2008. Alessandra, Claudia, and Gulio Famiglietti appeared, unaccompanied by counsel.[2] These sureties stated that their mother was aware of the hearing, but was feeling stressed by other obligations and chose not to appear. During the hearing Alessandra, Claudia, and Gulio Famiglietti responded to the Court's questions and presented information (by way of proffers) on their own behalf and on behalf of their mother.

Over the course of the hearing on March 19th the undersigned identified for the sureties each of the factors or considerations that the courts have deemed relevant to ruling on this kind of motion and invited the sureties, one factor at a time, to offer any information or argument they would like this Court (or the District Judge in Houston) to consider. As pertinent, the sureties' inputs are noted in the section of this REPORT in which we apply the relevant legal principles to the information proffered by the parties.

As explained on the record, it is not clear, in the absence of a direct order of reference from the District Judge in the Southern District of Texas to whom this case has been assigned, that the undersigned has authority to rule on the government's motion. Given that uncertainty, the undersigned will forward this Report and Recommendation to the District Judge in Houston to whom this case has been assigned. Simultaneously, we will mail a copy of this Report and Recommendation to the sureties and the defendant at their last known (shared) address.

The Court hereby ADVISES THE SURETIES that if they wish to submit to the assigned District Judge in Houston (the Honorable David Hittner) any objections to or any comments on this Report and Recommendation, they must file in the U.S. District Court for the Southern District of Texas a writing that sets forth their objections (and the bases therefore) within ten court days after being served with this Report and Recommendation. 28 U.S.C. section 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b)(2).[3] If the sureties file any such writing, they must simultaneously serve it on the United States Attorney for the Northern District of California and on the United States Attorney for the Southern District of Texas.

After considering all the evidence in the record, the sureties' statements at the hearing, the government's arguments, and the pertinent authorities, the Court RECOMMENDS that the United States District Court for the Southern District of Texas, GRANT THE GOVERNMENT'S MOTION FOR JUDGMENT (AGAINST THE DEFENDANT *AND* ALL FOUR OF THE SURETIES) ON THE FORFEITURE OF THE BOND. The reasoning that supports this recommendation is summarized below and was explained in detail to the sureties on the record during the March 19, 2008, hearing.

### *THE PERTINENT LEGAL PRINCIPLES*

Federal Rule of Criminal Procedure 46(f) is the ultimate source of the legal

---

**2.** They stated on the record that they sought to retain an attorney but ultimately decided that they could not afford to do so.

**3.** The sureties can contact the Clerk of the Court for the Southern District of Texas— Houston Division at 713–250–5500 for information about how to file a document in that court.

principles that control the court's disposition of this dispute. Under that Rule, the court "must declare the bail forfeited if a condition of the bond is breached." F.R.Cr.P. 46(f)(1). It is undisputed that defendant has breached core conditions of the bond by absconding and remaining a fugitive—now for about a year. Thus, the court is required to forfeit the bond.

Rule 46(f) of the Federal Rules of Criminal Procedure also permits a court to set aside such a forfeiture (in whole or in part) if the surety surrenders the defendant into custody or if "it appears that justice does not require bail forfeiture." F.R.Cr.P. 46(f)(2)(A) and (B). As the Famiglietti sureties have not surrendered the defendant into custody, it is only the latter provision of this Rule that the sureties may seek to invoke in the case at bar. Thus, we consider whether the sureties have shown that "justice does not require bail forfeiture."

The precedents in this Circuit make it clear that district courts have considerable discretion in deciding this issue and in fixing conditions on which all or some portion of a bail forfeiture should be set aside.[4] The authorities instruct district courts, when making these determinations, to take into account the following non-exhaustive list of considerations: (1) whether the defendant's breach of the conditions of release was willful, (2) whether actions by the government, unknown to the surety, increased the risk that the defendant would violate the terms and conditions of his release,[5] (3) whether the surety assisted in apprehending the defendant, (4) whether the surety assisted, played any role in, or was in some measure responsible for the conduct by the defendant that breached the release conditions, (5) any cost, inconvenience, or prejudice suffered by the government as a result of the defendant's breaching conduct or of the surety's actions or inactions, (6) whether the surety was a professional bail bondsman or was a family member or friend of the defendant, (7) the appropriateness of the amount of the bond, and (8) any other pertinent mitigating circumstances that were not taken into account when addressing the other identified factors. *See United States v. Nguyen,* 279 F.3d 1112, 1115–16 (9th Cir.2002); *United States v. Amwest Surety Insurance Company,* 54 F.3d 601 (9th Cir.1995).

As with many similar balancing tests, courts that are working in this arena are not engaged in a mathematical exercise. They are not simply to determine how many of the pertinent factors favor the surety and how many favor the government, then base their ruling on which par-

4. The Court's analysis is based on authorities from the Ninth Circuit. The bond was issued in California by this court, and defendant resides here and was being supervised by a Pretrial Services officer from the Northern District of California. However, as previously explained, we will be making a report and recommendation to the Court in *Texas.* Given all the circumstances, it is not clear whether the controlling authority emanates from the Ninth Circuit or from the Fifth Circuit. We have seen no reason to conclude, however, that applying principles that the Fifth Circuit has articulated would lead to a different recommendation than we make in these pages.

5. *See, e.g., United States v. Aguilar,* 813 F.Supp. 727 (N.D.Ca.1993), where the government, without informing the sureties, enlisted the cooperation of the defendant in efforts to catch bigger fish, sending him out of state to participate in what was supposed to be a sting operation. Farther away from home and the influence of his sureties, and perhaps becoming progressively more apprehensive about his own safety as a result of his undercover work for the government, the defendant fled. These considerations played a significant role in the district court's decision to set aside the forfeiture.

ty's raw numerical score is higher. Rather, the authorities make it clear that the relative weight the courts may ascribe to the acknowledged factors can vary from case to case—and that in some circumstances one or two factors might play a determinative role, even if all the other factors seemed to point toward a different outcome.

It also is important to keep clearly in focus what the benchmarks or measures are that courts should use when they are deciding how much weight to ascribe, in any given factual setting, to the factors the courts are balancing when deciding whether a surety has shown that "justice does not require bail forfeiture." The ultimate sources of such benchmarks or measures are the purposes that animate the Bail Reform Act and the particular balance of policies by Congress reflected in that legislative scheme.

Thus, when judges fix the relative weight of the competing factors they must determine, in the specific factual situation before them, what effect a proposed weighting would have on those purposes and on the way Congress chose to balance policies. Courts may ascribe considerable weight to a factor when doing so clearly would promote the purposes of the Act. Thus, courts should consider not only whether a given breach was willful, but also the nature of the condition that was breached. Was the breach of a core provision of the bond, a provision that is central to the purposes of the Bail Reform Act? For example, did the breach consist of committing a violent crime? Or has the defendant fled the country and remained a fugitive?

On the other hand, it would not be appropriate to ascribe considerable weight to a factor if doing so would tend to undermine the purposes of the Act or to upset the balance of policies reflected in the statute.

In short, it is Congress' purposes, and Congress' balance of competing policy considerations, that must determine whether "justice does not require bail forfeiture." Stated differently, the content of the word "justice" (the criteria for its determination) must derive from the purposes of the Bail Reform Act—not from some floating or abstract sense of fairness or from concepts or policies without roots in that Act.

■ One of the questions that might be raised by the matter at bar is what kinds of considerations a district court may take into account under the last of the acknowledged categories: 'other mitigating factors.' While we are not sure what the full range of considerations are that might be included appropriately in this category,[6]

---

**6.** Some possibly 'mitigating' considerations that have occurred to us (but that do not exist here) might arise out of the circumstances in which the surety made the decision to sign the bond. For example, an unsophisticated surety might not have understood important terms of the bond contract because the court failed to inform the surety what the central terms of the bond were and what the consequences to the surety could be if the defendant breached. Or the government might fail to disclose (in the proceedings leading up to the bond decision) significant information known to it that obviously increased the risk that the defendant would not comply but that the proposed surety was unlikely to know.

Or a surety who is a close relative or friend of the defendant might have been pressured to make a hasty and only emotionally driven decision immediately following the defendant's arrest—when she was first informed of the charges.

Another kind of mitigating circumstance might arise out of the nature of the breach by the defendant. Some breaches are more fairly described as technical than others—and some that are more substantive nonetheless have no adverse consequences for any other person, the government, or the court. Thus, the nature of the breach (which is a different inquiry from whether the breach was "will-

the authorities clearly identify one kind of consideration that this category *cannot* include. Surprisingly, at first blush, district courts are *not* permitted to take into account, when deciding whether a surety has shown that "justice does not require bail forfeiture," the nature and relative severity of the harm that would be visited upon the surety if the court refused to set aside the forfeiture. In *United States v. Nguyen*,[7] for example, the Court of Appeals for the Ninth Circuit expressly refused to adopt "a 'loving relative' exception to [the Circuit's] bond forfeiture jurisprudence." In upholding a trial court's refusal to set aside even part of a forfeiture, the majority in *Nguyen* clearly rejected the argument (advanced in the dissenting opinion) that judges should take into account (as a mitigating factor) the effect the forfeiture would have on the sureties—even if that effect would be devastating and the amount of money forfeited to the government clearly was much greater than the costs the government incurred because of the defendant's breach.

This position is consistent with the vast weight of authority from other federal jurisdictions. *See United States v. Diaz*, 811 F.2d 1412, 1416 (11th Cir.1987) ("The court realizes the distress that has been thrust on the appellants by these events, however, we are obliged to find that there was no abuse of discretion by the lower court in its dismissal of this request for remission of forfeited bond. Even though appellants stand to lose their house as a result of this forfeiture, the 'financial plight' of the movant is not within the criterion with which the court may base its decision on remis-

sion.") (internal citations omitted); *United States v. Gutierrez*, 771 F.2d 1001, 1004 (7th Cir.1985) ("The court … may not consider the financial plight or interests of the movant."); *United States v. Skipper*, 633 F.2d 1177 (5th Cir.1981) (where defendant is still at large, justice required enforcement of forfeiture despite significant financial hardship to sureties); *see also United States v. Bradley*, 43 F.R.D. 278 (W.D.Pa.1967); *United States v. Ciotti*, 579 F.Supp. 276 (W.D.Pa.1984).

■ What might account for this seemingly harsh view? At the outset, we must emphasize that a desire to punish either the defendant or the surety plays no role in this policy arena.[8] The purpose of enforcing the terms of bonds is not to punish anyone—but to increase the likelihood, generally, that defendants and sureties will take their bond commitments seriously and that defendants will attend scheduled court appearances and not engage in criminal activity while they are on pretrial release.

■ If it is not an interest in inflicting punishment, what other considerations might support the apparently harsh notion that judges who are ruling on motions to set aside bail forfeitures may not consider the severity of the financial blow that enforcing the bond would deal to the sureties? We can find at least some justifications for this notion when we consider the circumstances in which trial courts must make bond decisions and the purposes that bonds are intended to achieve. By clear Congressional mandate, a federal trial court is required to release a defendant who has only been accused, not convicted,

---

ful") might, in some circumstances, be considered a mitigating factor.

7. 279 F.3d 1112, fn. 2 (9th Cir.2002).

8. We feel constrained to make this point clearly—in part because the dissent in *United*

*States v. Nguyen*, 279 F.3d 1112, 1118 (9 Cir.2002), might be construed as suggesting that the primary driver in bond enforcement decisions is an interest in punishing defendants or their families.

if the court can identify any set of terms and conditions that would reasonably assure the particular defendant's appearances in court and the safety of the community. Thus, clear federal policy, rooted in the presumption of innocence, compels district courts to be open to all measures or terms that appear reasonably likely to reduce the risk that a defendant will flee or commit violent crimes while the federal prosecution is pending. It is in this setting that trial courts make decisions about bonds—the core purpose of which is enable judges to honor every defendant's entitlement to pretrial release whenever a set of constraints and personal pressures can be fashioned that deliver the requisite reasonable assurances.

Often, a surety bond is essential to delivering the reasonable assurances on which defendants' entitlement to release turns. Persons accused of federal crimes often have substantial criminal records and few assets. They usually have a pattern of making bad judgments. Without help, many would remain in custody, sometimes for years, before their federal case is resolved. And professional bail bondsmen generally are reluctant to make commitments on behalf of federally charged defendants because in federal courts any violation of terms of release can support forfeiture of a bond, while in many state courts a surety is exposed to loss on a bond only if he cannot deliver the defendant back to the court. These circumstances leave federal defendants who seek pretrial release (and federal judges trying to comply with their constitutional and statutory duties) peculiarly dependent on commitments by family members and friends.

To serve the purposes of the Bail Reform Act, however, bail commitments by family members and friends must be real. This follows for several reasons. First, judges who are making bail decisions need to develop some sense of the sincerity and meaningfulness of a proposed surety's professed confidence in the defendant. An assurance to the court by a proposed surety that the defendant will abide by the conditions of release may acquire more credibility as the consequences that the surety will suffer if the defendant breaches increase in severity. Generally, a surety who believes that she will suffer substantially if the defendant breaches is more likely to exercise considered judgment about the reliability of the defendant than a surety who doesn't expect to suffer significantly if her assurances to the court are ill-placed. It would impair substantially the court's ability to assess how real the surety's apparent vote of confidence in the defendant was if the surety were permitted to assume that her promises were not likely to be enforced.

Another factor in this equation is the likelihood that the surety will make some meaningful effort to monitor the defendant's conduct while he is out of custody and put pressure on him to comply with the rules. A surety who believes that her exposure under a bond is real and significant is more likely to care about how and what the defendant is doing while he awaits the disposition of his case—and is more likely to put pressure on the defendant to toe the line. One primary purpose of having family members or close friends sign bonds is to enlist them as extra monitors and additional sources of pressure on the defendant to honor the terms of his pretrial release. A judge who thinks that a surety assumes that her bond commitments are not likely to be enforced cannot expect that surety to serve as a significant source of discipline on the defendant. And such an additional source of discipline may well be necessary for the court to develop the reasonable assurances (about court appearances and community safety) without

which the defendant's entitlement to pretrial release would never mature.

There is an additional (related but not identical) reason for which it is important that sureties and defendants understand that bond commitments made by sureties are real (i.e., likely to be enforced). A judge who is trying to decide whether he can release a defendant needs to have some level of confidence that the defendant himself will feel pressure (from within, not just from without) to comply with the terms the court sets. One important source of such 'internal' pressure on a defendant is fear that if he breaches, he will impose real harm on people he cares about. That source of pressure would be diluted, if not extinguished, if the defendant were permitted to infer that nothing bad (of any consequence) would happen to his sureties if he breached. Again, a judge who thought that a defendant held this view would be less able to develop the assurances the law requires in order to release a defendant before trial.

For all of these reasons, if a judge could not have confidence that proposed sureties believe that their exposure on a bond is real, i.e., that they will in fact be required to pay the government the face value of the bond if the defendant commits a serious breach of the bond's terms, the judge would not be able to ascribe any meaningful weight to the proffering of sureties when determining whether there is 'reasonable assurance' that the defendant will make his appearances and not commit any violent crimes. A judge who cannot ascribe real weight to the proffer of sureties will much more often be forced to keep defendants in custody until their case is resolved—sometimes a period of several years. So it is essential to protecting the rights of defendants that judges be able to attach real significance to commitments by sureties—and judges can do that only if

they can assume that sureties really believe they will be required to pay the face value of the bond if the defendant commits a serious breach of its terms.

These considerations set the stage for understanding why courts are not permitted to take into account the severity of the financial hardship that a surety would suffer when courts are deciding whether a surety has shown that "justice does not require bail forfeiture." For many federal defendants, the only possible source of sureties is their circle of family members and friends. But a significant percentage of persons charged in federal court with crimes are poor—and their families and friends have quite limited financial resources. So, in many instances, the proffer of potential sureties consists only of people with limited means. The fact that they have limited assets and modest incomes, however, need not make their willingness to serve as sureties insignificant in the pretrial release calculus. The risk they would take by signing a bond could be very real because the government could collect modest amounts from them, relentlessly, over a considerable period, and because the existence of a large debt to the federal government would ruin their credit rating and could fatally impair their ability to achieve other economic ends.

This kind of risk, however, and the reality it gives to surety commitments by people without substantial resources, would disintegrate if such proposed sureties knew that the government could not force them to pay the bond amount simply because they had limited assets and collecting on the debt would impose great financial hardship on them. Thus, if severity of financial hardship were a ground for setting aside a forfeiture, or for significantly reducing the amount owing, courts could not assume that sureties with limited means would believe their bond commit-

ments were real.[9]  Not being able to make that assumption, courts could not ascribe significance in the bail calculus to proffers of sureties with limited means.  Without meaningful support from such sureties, many more defendants would be required to remain in jail for the long periods before their cases are resolved.  And that development would contravene the fundamental purposes of the Bail Reform Act. It follows that if courts are to give reality to the rights of defendants that that Act confers, they must not permit bond commitments, so essential to pretrial release, to be eviscerated by the magnitude of the potential impact on the surety.  In fact, the greater that magnitude, the more meaningful the bond commitment.  And the more meaningful the bond commitment, the more likely the release of the defendant.

### APPLICATION OF THE LEGAL PRINCIPLES TO THE PENDING MATTER

We turn now to consider, one at a time, the factors that the authorities teach us are relevant to determining whether the sureties can establish that "justice does not require bail forfeiture" and, therefore, that some or all of the forfeiture should be set aside.

### (1).  *Was the defendant's breach of the conditions of his release willful?*

■  Neither the circumstances nor the sureties suggest any fact that might lend support to an inference that Mr. Famiglietti's absconding was not willful.  He clearly knew that he was required to return to the half-way house in Oakland and he did not do so.  He remains a fugitive.

Moreover, according to the government's uncontradicted proffer, after he absconded the defendant applied for a new Panamanian passport from that country's consulate in Mexico City.  The sureties have not attempted to contradict the government's assertion that the defendant is currently in Panama.

The weight of this factor is considerable not only because the breach clearly was willful, but also because the condition of his bond that the defendant breached is so central to the purposes of the Bail Reform Act. A critical objective of that Act is to assure that defendants make their court appearances.  A breach that consists of fleeing to another country and remaining there indefinitely as a fugitive cuts to the core of the system Congress established.  Each breach of this character also imperils Congress' purposes by making it more difficult—as a matter of sociology, if not law—for other defendants, many of whom

---

9.  Paragraph 2 of F.R.Cr.P. 46(f) permits courts to set aside portions of forfeitures.  In exercising their discretion under this Rule, courts are required to consider whether remitting some portion of the bond would be consistent with the applicable legal principles.  While a surety with limited means might suggest that a court should set aside a significant portion of a forfeiture when it is clear that enforcing the full debt would impose severe financial hardship, adopting this approach would have virtually the same eviscerating effect on bond promises by people of limited means as the notion that forfeiture should be set aside fully on a showing of such hardship

(assuming no other fault in the surety in the circumstances surrounding the defendant's breach).  If sureties thought that the actual value of the bond would be determined after the fact (of breach) on some sliding scale of severity of financial impact they would not take the face amount of the bond, set by the court, seriously.  They would not know what their real exposure was—and could be encouraged to assume that, at the most, it was some unpredictable but substantially smaller figure.  If sureties were permitted to make these kinds of assumptions, courts could ascribe little or no weight to their willingness to sign bonds with significant face value.

might be quite reliable, to secure pretrial release.

(2). *Did any actions by the government, unknown to the sureties, increase the risk that Mr. Famiglietti would violate the conditions of his bond?*

■ There is no evidence to support even a suspicion that any action or inaction by the government played any role in the breaches by Mr. Famiglietti. The government denies that it did anything that had any effect on the level of risk that the sureties voluntary assumed—and the sureties have been able to point to nothing that would cast any doubt on this denial by the government.

At the hearing on the government's Motion the sureties stated that their father had reported that he was not receiving appropriate medical treatment during the time he was in custody prior to his release to the half-way house. The sureties implied that this might have been a factor in his decision to flee. As the Court explained at the hearing, however, the allegedly inadequate medical care occurred *before* the defendant was released from custody and *before* the sureties signed the bond on March 15, 2007. Therefore, even if a failure of prison personnel to be appropriately responsive to the defendant's medical needs is the kind of government action contemplated by this factor, the sureties were aware that their father perceived his medical care to be inadequate *when they assessed the risk* that they would take by signing the bond. They chose to sign nonetheless.[10]

As noted above, this factor could favor setting aside the forfeiture only if (1) the government took action after the defendant's release that increased the risk that he would violate the terms of his release and (2) if the sureties were not aware of that action. The sureties have pointed to no evidence, circumstantial or direct, that would tend to support either of these necessary findings.

(3). *Have any of the sureties assisted in apprehending the defendant?*

■ The defendant has not been apprehended. And the sureties have not shown that any of them has done anything to help the government return him to court.

In contrast, there is some support (much of which is circumstantial) for suspicion that the defendant has had repeated contact, since he fled, with his wife. The record indicates that the defendant contacted his wife on at least one occasion. Mrs. Famiglietti reported to Pretrial Services Officer Gibson that the defendant called her on or about April 2, 2007. Mrs. Famiglietti also told Ms. Gibson, however, that the defendant would not tell her where he was, but that she "told him to try to come home." PSCRR at 25.

In addition to this acknowledged contact, Mrs. Famiglietti does not deny that she withdrew some $12,000 from the couple's credit union account shortly after the defendant fled—but her children claim that she can account for and document how she spent all of this money legitimately. Similarly, Mrs. Famiglietti does not

---

**10.** We are not at all confident that this is the type of government action that courts are to take into account when conducting their analyses in this context. Typically, the courts focus on the conduct of law enforcement agents and prosecutors to see whether they have put the defendant in a situation that could significantly increase the likelihood that he would flee, commit a crime, or breach some other condition of his release, e.g., by sending the defendant outside the jurisdiction or asking him to interact with known criminals. See, e.g., n. 5, *supra.*

deny that she has stopped in Mexico City many times on her way to Panama, or that she has spent considerable time in Panama over the past year. She contends, again through her adult children, that her visits to Panama were only to attend to an ill parent. She elected not to come to the hearing, however, where she could have so testified under oath—and could have confirmed that she had had no contact (direct or indirect) with her husband since April 2, 2007.

Despite the possibility that sometime during the past year the defendant has been in contact with his wife or some of his adult children, none of the sureties has reported any such contact to the Court, to Pretrial Services, or to the government. Nor, significantly, have the sureties affirmed that none of them has had any such contact.

    **(4).** *Have any of the sureties encouraged, assisted, or supported the defendant in violating the terms of his release? Have any of the sureties helped him remain a fugitive?*

■ No evidence has been presented to the Court that Alessandra, Claudia, or Gulio Famiglietti knew in advance that the defendant intended to violate the condi-

tions of his bond, assisted him in absconding, or interfered with the government's ongoing effort to bring him to justice.

The situation with respect to Mrs. Famiglietti, however, is appreciably more ambiguous. As noted above, about two weeks after he fled she withdrew $12,000 from a credit union account that she and her husband shared. She has passed through Mexico City (where the defendant secured a Panamanian passport after he absconded) several times during the period that Mr. Famiglietti has been a fugitive, and she has spent considerable time in Panama (where the government believes the defendant is hiding) during the past nine months. While her adult children have proffered explanations for these circumstances, she has declined to appear in person in these forfeiture proceedings. And the proffered explanations do not foreclose the possibility that she has spent time with her husband in Panama or otherwise lent support to his efforts to evade his obligations in this case.[11]

Two additional considerations give rise to concerns about Mrs. Famiglietti's role. One is that she has lived in the same house as defendant for years—the house in which agents found, according to the government's proffer, "a large collection of

---

**11.** At the March 19th hearing, Gulio, Alessandra, and Claudia Famiglietti did not dispute that their mother withdrew $12,000 or that she has traveled to Panama and Mexico City. However, they contend that the inferences the government draws from these facts are inaccurate. According to these sureties, (1) their mother decided not to travel to Texas because one of the two court appearances in that state was cancelled—a fact that, in the family's view, minimized her need to go, (2) their mother withdrew $12,000 in order to pay the defendant's California and Texas attorneys and to pay medical bills for her ailing father and her travel expenses to visit her parents, (3) their maternal grandfather was ill and recently passed away and their mother trav-

eled to Panama, not to be with the defendant, but to see *her* father and mother, (4) that the trips to Mexico City were nothing more than stop overs on Mrs. Famiglietti's way to Panama and that she never left the airport in Mexico City—but merely changed planes on her way to Panama. These sureties represented to the Court that they can provide evidence in support of these representations if necessary.

At this juncture, we need not decide the import of Sandra Famiglietti's actions, because even if she, like the remaining three sureties, had no apparent involvement in her husband's efforts to abscond, it would not change our ultimate recommendation.

over 3700 pictures of child pornography." Transcript March 7, 2007, hearing at 11. Coupled with all the pictures, movies, sex novelties, and the children's underpants that were found among the defendant's effects at the airport in Houston, the Court is constrained to wonder whether Mrs. Famiglietti (and/or other members of the family) knew (or at least suspected) well before Mr. Famiglietti was arrested that he was engaged in the kind of conduct that supports the pending charges.

The second source of concern is Mrs. Famiglietti's decision not to accompany her husband to Houston to make his court appearance and to consult with his lawyer. Mrs. Famiglietti had assured the Pretrial Services Office here that she would accompany her husband on this trip. PSCRR at 14, 16, 17. On March 21st, she emailed to the supervising officer a copy of an itinerary that confirmed that both she and her husband would be making the trip. Motion at Ex. F. Then, on the day she and her husband were scheduled to fly to Houston (March 27, 2007), she left a voicemail message with the Pretrial Services Office advising that her husband would be flying to Houston even though the appearance in Federal court had been postponed for a week. PSCRR at 20. She did not clearly indicate, in this message, that she had decided not to accompany the defendant, and she did not return the Pretrial Services Officer's March 28th phone call. See *Id.*

Mrs. Famiglietti's representation that she would accompany the defendant to Texas provided the Pretrial Services Office with some reassurance that the defendant would not take that opportunity to flee. Sandra Famiglietti is a surety exposed to a sizeable monetary risk in the event her husband flees. It follows that we would expect her to be a source of pressure on the defendant to return to Oakland as

required if she were with him in Texas. By choosing (without approval from Pretrial Services) not to accompany her husband on this trip, Mrs. Famiglietti foreseeably increased the risk that he would flee. Moreover, this decision, never clearly communicated to Pretrial Services and never approved by anyone connected with the Court, causes the Court to wonder whether Mrs. Famiglietti knew in advance, or suspected, that her husband might use the opportunity that being in Arizona presented (as a scheduled part of the trip back to Oakland) to flee the country.

> (5). *Has the breaching conduct by the defendant caused the government to incur significant expense or to suffer inconvenience or prejudice?*

█ The defendant's breaching conduct clearly has caused the government prejudice. As defendant has remained a fugitive for a year, the government has not been able to move his case toward trial. Witnesses memories fade over such a period—as do trails that otherwise might lead to significant evidence. And it is far from clear that, even if he were located, the defendant's appearance for trial in the United States could be secured. If he is found in Panama, for example, the authorities in the United States would need the cooperation of the government of Panama to secure his arrest and his extradition. Whether such cooperation would be forthcoming is by no means certain. Thus, the government's entitlement to try the case— and its duty to try the case fairly—are imperiled.

As important, in this age of international internet communication, Mr. Famiglietti remains free to engage in or to encourage the kind of destructive conduct with which he stands charged. He is subject to no external restraints—and there are no means to assure that he receives appropri-

ate professional attention (e.g., mental health diagnoses and treatment).

In addition, it is reasonable to assume that Mr. Famiglietti's flight and continuing status as a fugitive have resulted in the government incurring more than *de minimis* expense (as agents and lawyers have tried to track his routes and to uncover his whereabouts in Latin America)—and that retrieving him from overseas would impose considerably more expense on the executive branch if he is apprehended.

■ There is a suggestion in a few cases (not binding here) that there should be some relationship between the amount of the forfeiture on a bond and the cost burdens that the defendant's breach imposed on the government. With respect, this suggestion seems misplaced. Citing two cases decided in other circuits (the Fourth and the Eighth) before the Bail Reform Act became law, the dissent in *United States v. Nguyen*, 279 F.3d 1112, at 1120 and fn. 10 (9th Cir.2002), argued that "[r]emission should be used to accomplish a rough proportionality between the extent of the forfeiture and the extent of the government's burden." Were courts to accept this approach, however, they would defeat the primary purposes of setting bail and posting bonds under the Bail Reform Act: to put pressure on defendants to appear in court when ordered, to commit no crimes, and to comply with the other important conditions the court imposes on their pretrial release (e.g., do not use or possess drugs or weapons).

In many cases the bond commitments that sureties are asked to make would lose most of their significance if defendants and their sureties knew that the face amount of the bond that was set by the court was not the real amount of their exposure—and that that exposure likely would be reduced later (by some indeterminate amount) based on how much extra cost the government could prove it incurred as a result of the defendant's breach. Bond commitments made in that context would not serve as effective deterrents to many kinds of breaches—because defendants and sureties could safely assume that if the breaches (e.g., selling drugs to undercover agents, or hiding someplace within the jurisdiction) were local the consequences (as measured by extra costs imposed on the government) would be of no great moment. In that environment, the only function that the face value of the bond would serve would be to set a cap on the sureties' and the defendant's exposure; otherwise, the face value would tell them almost nothing about the real magnitude of the risk they take when they agree to sign.

(6). *Were the sureties professional bail bondsmen or were their connections with the defendant personal (e.g., as family members, friends, pastors, etc.).*

The four Famiglietti sureties are not professionals in the bail bond business. They are the wife and adult children of the defendant. It follows that this factor bears no weight against the sureties.

(7). *Was the amount of the bond appropriate?*

■ The amount of the bond was $250,000. Having been responsible for fixing bond amounts in Federal cases for more than 20 years, this Court can affirm that the $250,000 figure was well within the range of bonds commonly set in this jurisdiction for similarly situated defendants.

Fixing the amount of a bond in any given case is hardly an exact science—but it calls for an exercise of experience-based judgment that often turns on very circumstance-specific and defendant-specific con-

siderations.[12]  Moreover, the different pur- poses that bonds are intended to serve in

**12.**  The dissent in *United States v. Nguyen*, 279 F.3d 1112, at 1118 (9th Cir.2002), speculated that the $100,000 bond amount in that case "was probably designed to cover the expense of fetching Nguyen if he fled to a foreign country or otherwise put the government to great expense."  This speculation is supported by no cited evidence and is likely incorrect.  Having set bond amounts for more than twenty years, this Court can report never having even considered the possible cost of fetching a defendant in fixing bond amounts. Nor has this Court ever heard of any other judge basing a bond amount on a guesstimate of this kind.

There are at least three reasons that it is unlikely that a judge would base a determination of the amount of a bond on any such consideration:  (1) it is impossible to predict, even within an expansive zone, what the cost of fetching a defendant might be—or to predict the size of any other kinds of costs a defendant's breaches might impose on the government, (2) the Bail Reform Act nowhere even hints that courts are to consider costs to the government of possible breaches when courts go about identifying the terms and conditions that will provide reasonable assurance that the defendant will make his appearances and not engage in criminal activity during the pretrial period, and (3) there is no logical connection between the possible cost of fetching a defendant and the purposes of requiring the signing of a bond—which are, essentially, to pressure the defendant to show up in court when he is supposed to and to refrain from engaging in criminal activity.  In fact, basing the amount of the bond on a guess about what it might cost the government if defendant breached could undermine the primary purposes of bonds if that guess yielded a figure clearly too low to impose any real pressure on the defendant to comply with the terms of the bond.  That circumstance would be especially likely to arise when defendants and/or their sureties have considerable assets or the ability to generate considerable income.

Before Congress adopted the Bail Reform Act in 1984 some courts had suggested that bond jurisprudence (to use too big a word) should be rooted at least in part in concepts drawn from the theory of liquidated damages. Perhaps these roots in contract law help explain the notion that there should be some play or relationship between the amount of a bond, on the one hand, and, on the other, the anticipated (but fundamentally unpredictable) costs that a breach would impose on the government.

After adoption of the Bail Reform Act, however, it is not clear that there is any source of support in the statutory scheme for the notion that the size of a bond should be correlated with the court's or the government's guesses about how much it might cost to return a fugitive to custody or to compensate for harms caused by other possible breaches. We acknowledge that about a decade after passage of the Bail Reform Act the Court of Appeals for the Ninth Circuit declared (in apparent dictum) that it "regards forfeiture as a form of liquidated damages."  *United States v. Amwest Surety Insurance Company*, 54 F.3d 601, 604 (9th Cir.1995).  But liquidated damages for what?  Only for the unpredictable costs of retrieving a fugitive?  Or for that cost plus any others caused by breaches?

Moreover, after adoption of the Bail Reform Act, it is not clear why it remains conceptually necessary to rationalize enforcement of the terms of a bond on a liquidated damages theory.  Apparently worry that bonds would be invalidated as unlawful forms of 'punishment' was one source of the liquidated damages fiction.  At least when the surety is in no sense at fault for the defendant's breach, however, it is difficult to understand how enforcing the terms of the bond could be viewed as a 'punishment.'

More to the point, Congress clearly intended to displace traditional approaches to pretrial release decisions when it enacted the comprehensive scheme set forth in the Bail Reform Act. That legislation interred the notion that the sole purpose of a bond (or of any other term of pretrial release) was to assure the defendant's appearance in court.  Rather, the Bail Reform Act reflects at least two fundamental Congressional purposes:  to reasonably assure the appearance of the defendant in court and to reasonably assure the safety of the community.  The express adoption of this second purpose represents a significant change in pretrial release decision theory. With the addition of a second and very different purpose for imposing release conditions, the need to justify bond enforcement in terms of liquidated damages theory should have evaporated.  Rather, enforcement decisions now should be rooted in the purposes and

this setting can, in some circumstances, support different conclusions about what the face amount of the bond should be. In some cases, the risk of flight is minimal, but the risk of danger to the community is high. In that circumstance, the risk of flight would support setting the amount of the bond at a relatively modest level—but the danger to the community that would attend the defendant's release could lead the court to set a much higher bond amount.

In the case at bar, one of the drivers in the Court's decision fixing the amount of the bond was the nature of the alleged offense. The conduct of which the defendant is accused is deeply threatening to extremely important societal values, a determination that is clearly reflected in Congress' decision to create a presumption (rebuttable) of risk of flight and of danger to the community for persons charged with possessing or trafficking in child pornography. 18 U.S.C. § 3142(e). The conduct that this kind of crime rewards or encourages (the production of child pornography) can cause harm of the most personally severe and irremediable character—and can cause that kind of harm to be suffered

by the most defenseless of victims. It follows that a risk of recidivism of this kind of crime warrants especially acute concern—and justifies heightened precautionary measures. Such measures may include setting the amount of a bond at a level that is sufficiently high to put real pressure on the defendant (directly, as well as through the exposure faced by his sureties—people about whom the defendant presumably cares).

A related consideration may come into play when deciding what amount of bond is appropriate in a case like this. Data collected from a major study of persons arrested for possessing child pornography between July 1, 2000, and June 30, 2001, indicate that about 40% of these defendants were "dual offenders," meaning that they were accused not only of possessing child pornography, but also of actually victimizing minors sexually.[13] An additional fifteen percent of the persons in this group were accused of attempting to victimize minors sexually. While hardly definitive, this study gives rise to an additional concern about releasing persons who have been indicted for possessing or trafficking

---

policies that inform the new (as of 1984) statutory scheme. Under that scheme, the purpose of a bond is clear: to put pressure on the defendant to abide by *all* the terms and conditions of his release, not just the condition that he show up in court.

No party to this kind of bond could rationally understand that the face amount is determined by trying to guess what the economic consequences of a breach might be and thus to be sure that the persons or entities that suffer such consequences are compensated. There is no expectation in the signatories to the bond "contract" that it is in essence a liability insurance policy. I have never seen any evidence that that kind of thinking plays any role in the minds of persons in my court who are trying to decide whether to sign a bond to support a defendant's pretrial release. Unlike other bonds, a surety bond in a federal criminal case is not intended by anyone to be

an economic safety net for victims of breaches. Rather, it is intended to cabin and control the behavior of a person whose reliability is suspect and who might well present a danger to society.

13. The study in which this data is reported was conducted by The National Center for Missing and Exploited Children, a private, non-profit organization that was founded in 1984, and by the Crimes Against Children Research Center at the University of New Hampshire. Funding for this research was provided by Congress. The published report is entitled *Child–Pornography Possessors Arrested in Internet–Related Crimes: Findings From the National Juvenile Online Victimization Study* (2005) and is available from the Office of Juvenile Justice and Delinquency Prevention of the U.S. Department of Justice. See Executive Summary, at viii.

in child pornography: there is reason to fear that traffickers in such images may well also become involved directly in sexually victimizing minors. Concern about this possibility also supports setting higher bond amounts.

Another consideration that may affect the amount of the bond in a case like this is the view, fairly widely held, that defendants who have been extensively involved with child pornography can feel a compelling internal need to continue that involvement—a foreseeable need that might intensify their apprehension about being convicted and sentenced to custody, where they would not be able to indulge their habit.

There also seems to be widespread apprehension that persons who are sent to jail for molesting children or for involvement in child pornography are more likely than others to be targets of anger and abusive retribution from other inmates. These kinds of apprehensions, coupled with the reduced self-control that has been associated with involvement in child pornography, would appear to increase the risk of flight for defendants facing these kinds of charges.

The Court was alerted to an additional source of potential emotional instability in Mr. Famiglietti during the proceedings that concluded with the execution of the bond. He recently had undergone a substantial surgical procedure to address a serious heart condition. His heart condition, and the compromised physical condition in which he emerged from the surgery, left Mr. Famiglietti off emotional center and contributed, along with his arrest in Houston, to a state of depression. PSCRR at 2, 10, 14. In late February of 2007, prompted by his wife, he had begun to see a therapist. These circumstances increased the risk of flight by compromising the defendant's emotional health. It is reasonable to increase the amount of a bond as the risk of flight increases.

When fixing the amount of a bond, courts also may appropriately consider the resources that are or may be available to the defendant and to the sureties. To people with little money, a $50,000 bond might serve as a significant source of discipline. To wealthy people, however, a bond of that size would be of little constructive effect.

In the case at bar, it was (and is) unclear how much equity the defendant and the sureties had in the property they were to post. By some estimates, their equity might have been as high as $550,000. It also could have been much lower, perhaps even non-existent—depending, in part, on market variables that are essentially unpredictable. The fact that the value of the property was uncertain, as well as the possibility that a turn in the market could increase that value substantially over the considerable period that might elapse before the case against Mr. Famiglietti came to a close, contributed to the Court's decision to make the face amount of the bond substantial. An appreciably lower figure might have been taken less seriously by the defendant and his sureties—as they might hope that movement in market conditions would enable them to satisfy easily with the equity in the house any judgment that might be entered on a forfeiture.

Additional factors in assessing the defendant's resources included the fact that he had been able to afford a great deal of international travel and the possibility that he has assets or financial interests of some significance in other countries. Mr. Famiglietti admitted that he owned a piece of undeveloped land in Panama, where he had spent most of his life. He estimated the value of that property at $15,000—but offered no documentary support for that valuation. See, Pretrial Services Report,

dated March 6, 2007. The defendant admittedly has significant family ties in Panama—and the Court could not be sure what resources he might be able to draw on from there or elsewhere (e.g., Italy, where he lived for several years) either to support himself as a fugitive or to satisfy judgments that might be entered against him or his sureties. *Id.* Uncertainty about these possibilities also put upward pressure on the bond amount.

Finally, we note that a court may appropriately take into account, when assessing the magnitude of the risk of flight and what affect that risk should have on the amount of a bond, the extent, recency, and purposes of the defendant's international travel and how comfortable with or adaptable to foreign cultures he seems to be. As noted above, Mr. Famiglietti is a citizen of Panama, Italy, and the United States. He lived in Panama for some 40 years. He has close relatives and owns property there. He also lived in Italy for several years and has family there. In addition, he has traveled extensively in Europe and in Latin America. Pretrial Services Report, March 6, 2007, at 2 and 4. He obviously has broad language skills and would not be intimidated by the prospect of living outside the United States. These factors also increased the risk of flight and put additional upward pressure on the size of the bond.

Given all these considerations, we see no basis for concluding that the amount of the bond was inappropriate.

(8). *Are there any other pertinent mitigating circumstances that we have not yet taken into account?*

We are aware of no 'other mitigating factors' that would support setting aside all or part of the bail forfeiture.

■ It cannot be said that the defendant's breach is merely technical. He intentionally fled the jurisdiction and has remained a fugitive for a year.

The sureties do not contend that they did not understand the terms of the bond when they signed it—or what charges and potential penalties Mr. Famiglietti faced. Nor have they suggested that they were pressured or otherwise emotionally or intellectually impaired when they made this commitment on the defendant's behalf. As noted earlier in this Report and Recommendation, the undersigned went to great lengths, during the detention hearings that the sureties attended, to describe the circumstances the defendant was in, to explain the terms and conditions on which he would be released, and to emphasize the risks involved and the consequences that would ensue if the defendant violated his obligations. During these proceedings the Court also made it clear that each surety should decide independently whether to sign the bond and that each surety had an independent right to be removed from the bond—as long as the request was made before the defendant violated its terms.

> Now, there's another important thing I need to tell you folks. Each of you is making this decision independently. Each of you has a right to change your mind independently. If you decide ten minutes from now or whenever, "oh, we don't want to be on this risk anymore"— what I mean—I said "we." What I really mean is "I" for each one of you. You don't' want to be on the risk, you come down and tell me and I let you out. Okay?

> Now, if he's violated the rules in some substantial way before then, you owe the money. But if he hasn't, each of you has a right to get out of this. If you exercise that right by coming and saying "I want out," fine, I let you out and then I have to rethink, obviously, his situa-

tion. But you need to know you have that right.

See Motion at Ex. D at 15 (transcript March 15, 2007, proceedings). None of the sureties sought to be removed from the bond prior to the defendant's flight.

## WEIGHING THE FACTORS

As the discussion in the preceding pages makes clear, most of the factors that the authorities instruct us to consider in a setting like this weigh heavily in favor of granting the government's motion. The defendant's breach was incontestably willful—and the conditions he has violated are at the core of the purposes of the bond requirement. There is no reason to believe the government took any action, after the defendant was released, that increased in any measure the risk that these obviously competent sureties had knowingly and voluntarily accepted. None of the sureties has suggested that she or he has tried to help, or offered to try to help, return Mr. Famiglietti to court. The defendant's breach has caused the government to suffer severe prejudice and has exposed innocent persons to risk of harm. The breach also foreseeably imposes considerable expense on the government. The amount of the bond was in no sense excessive or inappropriate—and the sureties have not identified any special or unusual mitigating factors that might support remittance on the forfeiture.

Of the remaining two factors, one cuts in favor of the sureties: they are not professional bail bondsmen. As a matter of law, however, it would be inappropriate, at least in the absence of unusual circumstances that are not present here, for the Court to ascribe substantial weight to this factor. In federal court, at least in this jurisdiction, proffered sureties are virtually never professional bail bondsmen. Unlike proceedings in the courts of the state

of California, where sureties obligations on a bond generally will not be enforced as long as the defendant ultimately is returned to face the charges, in federal courts bail can be forfeited for any number of different kinds of breaches of terms and conditions of release.

Most significantly, bail can be forfeited in federal court if the defendant commits another crime (local or federal, within the charging jurisdiction or elsewhere) anytime before the termination of the case. This important difference between federal and state courts in the circumstances that would support forfeiture of a bond has caused virtually all bail bondsmen to refuse to do business with defendants who are charged federally. As a result, virtually every surety who is proffered in a federal criminal proceeding (at least in this jurisdiction) is not a professional bondsman—but comes forward only because of some personal relationship with the defendant (family member, friend, etc.). In this context, if courts were to ascribe significant weight in a forfeiture proceeding to the fact that a surety was not a professional bail bondsman they would risk frustrating central purposes of the Bail Reform Act by materially reducing the value of bond commitments by private sureties.

The one remaining factor to which we have not yet ascribed weight is whether the sureties were in some sense or measure responsible for or complicit in the breaching conduct by the defendant. It is not clear that all four of the sureties are similarly situated with respect to this factor. While we have seen no evidence that any of the defendant's three adult children encouraged him to flee or facilitated his flight, or that any of them have helped sustain him in his fugitive status, there are, as noted above, reasons to suspect that his wife might not be wholly free of culpability in this arena. At a minimum, it

is clear that she foreseeably increased the risk that he would flee when she decided, unilaterally and at the last minute, not to accompany him on the trip to Houston. And even though her children have proffered explanations for her withdrawal of the $12,000 two weeks after her husband fled, as well as for her multiple trips (through Mexico City) to and her substantial stays in Panama over the past several months, the Court cannot ignore the possibility that she has been in contact with and has lent at least some emotional support to her husband while he remains a fugitive.

On the record made in these proceedings, we conclude that while the government has proffered evidence that raises real questions about the role of Mrs. Famiglietti in her husband's continuing breach, the government has not proved that she played a role in his flight or in perpetuating his fugitive status. Nor has the government shown that any of the other sureties are in some measure responsible for their father's misconduct under the bond.

Given these conclusions, we cannot ascribe weight to this factor on the government's side of the balance. It does not follow, however, that the sureties have borne the burden of showing that this factor should be given considerable weight in their favor. None of the sureties has affirmatively declared that she or he did not know that their father or husband was considering fleeing, or that she or he has done nothing to assist or support his status as a fugitive, or that she or he has had no contact with him since he fled. Given the absence of any such affirmations (under oath or by way of proffer), coupled with the failure of Mrs. Famiglietti to come to court on either of the days the sureties expected this matter to be heard, and given the circumstances that give rise to suspicions about her knowledge and role, the Court cannot conclude that this factor adds any appreciable weight to the sureties side of the scales.

To summarize, our assessment of the pertinent considerations yields the following findings. One factor weighs lightly in favor of the sureties, one factor adds weight to neither side of the scales, and five others weigh in favor of declining to remit any part of the forfeiture. Two factors weigh especially heavily in the government's favor: (1) the willfulness of the defendant's breach of a core condition of his bond and (2) the prejudice and expense that his long-continuing breach have and will cause the government to suffer. We also cannot ignore the fact that the character of the defendant's breach creates a continuing risk of harm to the public—as he remains free to continue involvement with child pornography and, as far as we know, free of the restraining influence and the tools that therapy might provide.

This configuration of the pertinent considerations shapes the ultimate question we face: when a defendant has deliberately violated the most central terms of a reasonable bond, and when the government has done nothing to increase the risk that a competent surety knowingly and voluntarily accepted, should the Court set aside some part of the forfeiture solely because the government has not shown that the surety is in some measure responsible for the violations and is a family member? We conclude that the answer must be no.

To hold otherwise would do severe harm to the purposes of the Bail Reform Act and to the interests under that Act of defendants who can secure pretrial release only if courts give meaningful weight in the release calculus to surety commitments by family members and friends who do not have substantial assets or income. If a surety's innocence (with respect to the defendant's breaching conduct) and status as

a family member or friend were sufficient, standing alone, to justify setting aside a significant portion of a forfeiture, courts could have no confidence that bond commitments by such persons would be understood as real by either defendants or sureties. If a defendant could anticipate that his relatives would not face any serious consequences if he fled or engaged in criminal activity (as long as the government could not prove that they were involved in his misconduct), he likely would feel appreciably less pressure to abide by the core terms of the bond. Such a defendant could flee or commit crimes without worrying that his mother or his grandmother or his children or his wife would suffer. And when deciding whether to agree to serve as sureties, family members and friends would not need to be as careful or circumspect as they would be if they knew their exposure was both real and sizeable. Thus the courts could not have much confidence in the reliability or significance of their apparent expressions of confidence in the defendant.

Nor is it sufficient to suggest that the solution lies in partial remittitur of a reasonably set bond. The core shortcomings of partial remittitur (at least when based only on the innocence of the surety and her status as a family member) are arbitrariness and unpredictability. If a surety and a defendant knew that, regardless of the seriousness of the breach, an 'innocent' surety would not be required to pay the full amount of the bond, the capacity of "fear of consequences" to discipline the bond commitment process would be fatally compromised. Defendants and sureties could let themselves believe that remittitur would take most of the sting out of a breach. That possibility would receive way too much play in the minds of people already intensely motivated (by the desire to get out of jail, or to get their relative out of jail) to resolve doubts in their own favor.

The face amount of the bond would become almost meaningless. No one would know what the real amount of the bond was, i.e., what any particular judge on any given day would make the surety pay. Bond amounts fixed by judges with reputations for compassion or liberality would be especially vulnerable to disrespect—and thus would do little (regardless of how high they were set) to achieve the ends of the Bail Reform Act.

The upshot of all this would be to leave more defendants, especially poor defendants, in jail—because judges ruling on detention motions would not be able to ascribe significant weight to proposed commitments by non-professional sureties with limited means. Because this 'upshot' would frustrate the central purposes of the Bail Reform Act, we cannot endorse a line of reasoning that would support it. Instead, we must conclude that the sureties have failed to establish that, in these circumstances, "justice does not require bail forfeiture."

For the reasons set forth above, the undersigned hereby RECOMMENDS that the District Court in Houston GRANT the government's motion and ENTER JUDGMENT ON THE FORFEITURE, JOINTLY AND SEVERALLY AGAINST THE DEFENDANT AND ALL FOUR OF THE SURETIES, IN THE AMOUNT OF $250,000.

IT IS SO REPORTED AND RECOMMENDED.

Dated: March 28, 2008